RECORD NUMBER: 14-1275

# United States Court of Appeals
## *for the*
# Fourth Circuit

**ROBERT B. YOE, PAUL MICHAEL YOE,
GLENDA STUART, JEANNINE SHOUP, JOY MAYNARD,
JEFFREY S. YOE, JAMES D. YOE,**

*Appellants,*

– v. –

**BRANCH BANKING & TRUST COMPANY,
a North Carolina Corporation,**

*Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AT MARTINSBURG

# OPENING BRIEF OF APPELLANTS

RICHARD W. WESTON
WESTON LAW OFFICE
621 6th Avenue
Huntington, WV 25701
(304) 522-4100

*Counsel for Appellants*

CP  COUNSEL PRESS • VA – (800) 275-0668

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____        Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES    NO

2.      Does party/amicus have any parent corporations?                              YES    NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                          YES    NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation (Local Rule 26.1(b))?        YES     NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)       YES     NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                             YES     NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: _____        Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
**************************
I certify that on _____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

_____                    _____
        (signature)                                        (date)

# <u>TABLE OF CONTENTS</u>

Corporate Disclosure Statement

Table of Authorities ................................................................. ii

Jurisdictional Statement .......................................................... 1

Statement of the Issues for Review .......................................... 1

Case Statement ....................................................................... 1

     Statement of the Facts ......................................................... 2

Summary of the Argument ....................................................... 20

Standard of Review ................................................................. 24

Argument ................................................................................ 24

I.   THE STATUTE OF LIMITATIONS ON THE COMMON LAW FRAUD CLAIM DID NOT BEGIN TO ACCRUE UNTIL APPELLANTS OBTAINED RECORDS FROM THE BANK THROUGH SUBPOENAS AND MOTIONS TO COMPEL. .............. 24

    A.     Appellants Alleged that BB&T Actively Concealed *Pertinent* Facts ......................................................... 27

    B.     The Bank's Role in Advising the Beneficiaries Against Filing Suit Earlier Created Additional Tolling ........................ 37

Conclusion ............................................................................. 41

Request for Oral Argument ....................................................... 41

Certificate of Compliance

Certificate of Service

i

# <u>TABLE OF AUTHORITIES</u>

**Cases:**

*Beattie v. Skyline Corp.,*
   906 F. Supp. 2d 528 (S.D. W. Va. 2012) ..................................... 27, 41

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ................. 24

*Blake v. Charleston Area Med. Ctr.*,
   201 W. Va. 469, 498 S.E.2d 41 (W. Va. 1997).................................. 41

*Cordial v. Ernst & Young,*
   199 W. Va. 119, 483 S.E.2d 248 (W. Va. 1996)................... 28, 37, 38

*CSX Transp., Inc. v. Gilkison,*
   406 Fed. Appx. 723 (4th Cir. W. Va. 2010)....................................... 36

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,*
   637 F.3d 435 (4th Cir. 2011) ....................................................... 24, 25

*Gaither v. City Hosp.,*
   199 W. Va. 706, 487 S.E.2d 901 (W. Va. 1997)............................... 26

*Glascock v. City Nat'l Bank,*
   213 W. Va. 61, 576 S.E.2d 540 (W. Va. 2002)................................. 28

*Goodman v. PraxAir, Inc.*,
   494 F.3d 458 (4th Cir. 2007) ............................................................ 25

*McCoy v. Miller*,
   213 W. Va. 161, 578 S.E.2d 355 (W. Va. 2003)............................... 27

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com*, Inc.,
   591 F.3d 250 (4th Cir. 2009) ............................................................ 24

*Philips v. Pitt Cnty. Mem'l Hosp.*,
   572 F.3d 176 (4th Cir. 2009) ............................................................ 25

*Stemple v. Dobson,*
    184 W. Va. 317, 400 S.E.2d 561 (W. Va. 1990) ................................ 36

*Tellabs, Inc. v. Makor Issues & Rights,* Ltd.,
    551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) ................ 25

*Trafalgar House Constr. v. Zmm, Inc.*,
    211 W. Va. 578, 567 S.E.2d 294 (W. Va. 2002) ............. 26, 27, 36, 38

*United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*,
    745 F.3d 131 (4th Cir. Va. 2014) ...................................................... 25

*University of West Virginia Bd. of Trustees v. Van Voorhies*,
    84 F. Supp. 2d 759 (N.D. W. Va. 2000), *aff'd,*
    278 F.3d 1288 (Fed. Cir. 2002) ........................................................ 27

*Wade v. Danek Med.,*
    182 F.3d 281 (4th Cir. 1999) ............................................................ 26

*Wilson v. Xander*,
    182 W. Va. 342, 387 S.E.2d 809 (W. Va. 1989)................................ 37

**Rules, Statutes, and Other Authorities:**

18 U.S.C. § 1964(c) ................................................................................ 1, 19

28 U.S.C. § 1291 ...................................................................................... 1

28 U.S.C. § 1332 ...................................................................................... 1

Fed. R. Civ. P. 8(c) .................................................................................. 25

W. Va. Code  § 55-2-12 ............................................................................ 26

## JURISDICTIONAL STATEMENT

On December 2, 2013 Plaintiffs-Appellants filed their Complaint against Branch Banking and Trust Company (sometimes referred to as "BB&T" or "the Bank") alleging violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §1964(c), along with violations of West Virginia statutory and common law. State and federal courts share concurrent jurisdiction over complaints alleging violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §1964(c). The Court also had jurisdiction over Plaintiffs/Appellants' Complaint for common law fraud pursuant to 28 U.S.C. § 1332. The Court entered final judgment on February 25, 2014. Plaintiffs/Appellants timely filed a Notice of Appeal on March 26, 2014. This Court has jurisdiction pursuant to 28 U.S.C.§ 1291.

## STATEMENT OF ISSUES FOR REVIEW

1.      Whether the district court erred in dismissing as time-barred Plaintiffs/Appellants'common law fraud count.

## CASE STATEMENT

On December 2, 2013, the Appellants filed a lawsuit in the United States District Court for the Northern District of West Virginia against Appellees alleging violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §1964(c), along with violations of West Virginia statutory and

1

common law.   On February 25, 2014, the District Court dismissed both counts of the Complaint.  The District Court, extrapolating on the allegation that the Bank had misled the Appellants into believing that it was acting on their behalf, concluded that Appellants' entire Complaint for fraud was based upon the hyper-technical distinction between an executor and an executor's agent.  The District Court concluded, "Rosenberg Martin & Greenberg, LLP clearly stated in a 2011 Motion to Dismiss that the Bank was 'never appointed as a fiduciary' and was not 'recognized as an executor administrator of the estate' and thus had 'no duty to Plaintiffs'". J.A. 412-427. The Court also noted that Appellants had sued BB&T in the Berkeley County Circuit Court for breach of contractual fiduciary duties and negligence" in January 2011, and that "[t]he filing of that lawsuit indicates that Plaintiffs knew, or by the exercise of reasonable diligence should have known, that they had been injured.  . . and that BB&T's conduct had a causal relation to Plaintiffs' injury." Id.

**Statement of the Facts:**

At the time of his death, Harry W. Yoe solely owned approximately 336 acres of undeveloped farmland, including three residential structures and farm buildings in Berkeley County, West Virginia.  ("Yoe Farm").   J.A. 8.  Robert S. Hill, Jr., the Executor appointed under Harry W. Yoe's Last Will and Testament ("Executor Hill") was given specific instructions to sell the Yoe Farm after his

death and ensure that the proceeds were applied to the Beneficiaries named in his Will. The Beneficiaries from Harry W. Yoe's Will are the Plaintiffs in the underlying federal action and are the Appellants herein (sometimes referred to as "Beneficiaries"). J.A. 8-9.

Given the enormity of the task, Executor Hill, a retired Navy Chaplain with very limited knowledge about commercial real estate transactions, immediately sought assistance from the "professionals" at BB&T. J.A. 150-377. Within ten days of Harry W. Yoe's death, Executor Hill entered into a "Schedule of Fees" with BB&T wherein the Bank identified itself as a "Corporate Fiduciary," "co-executor," "co-fiduciary" and an "agent" of the Estate. J.A. 324. At that time, BB&T also entered into a Managing Agency Agreement with Executor Hill that entitled BB&T to, among other things, hold estate security and estate cash assets from the Yoe Estate, accept income on the assets, pay expenses incurred in administering the Yoe Account, and to employ persons to assist BB&T in the aforesaid activities. J.A. 10.

Unfortunately for Appellants, after BB&T gained these powers under the Managing Agency Agreement, it performed various self-serving activities regarding the disposition of the Yoe Farm with Executor Hill applying only limited supervision. J.A. 193, 194, 198, 214. BB&T's first self-serving act was choosing a risky businessman, Herbert Jonkers (sometimes "Mr. Jonkers"), to whom it had

already loaned money to, as the purchaser for the Yoe Farm. Specifically, as Appellants allege in their Complaint, Stephen Grove of BB&T insisted to Executor Hill that Herbert Jonkers ("Mr. Jonkers") was the best purchaser for the Yoe Farm, even though Mr. Jonkers would need to seller-finance the deal. *Id.* As the Complaint alleges, BB&T also informed Executor Hill that it reviewed Mr. Jonkers' financial affairs and found him to be a "sound' borrower. J.A. 13. BB&T advised Executor Hill that Mr. Jonkers was a developer for over twenty years and even caused the decedent's attorney, Kenneth Barton, to write him a letter stating that the sale was a prudent deal. *Id*.

Importantly, neither BB&T nor Attorney Barton disclosed that it had already rescued one of Mr. Jonkers' companies from a bad loan in 2003 and that it carried its own risk in his financial viability when they recommended to the Estate that it seller finance a deal with him.[1] J.A. 19. The Bank also never advised Executor Hill, even though it had loaned one of Mr. Jonkers' companies approximatelythree million dollarsonly several months before the Yoe Farm was sold , that the Estate could deal with another one of his already existing corporate entities rather than seller -finance a deal with a new company holding zero assets. J.A. 19-20.

---

[1] On August 27, 2003 BB&T had extended a letter of credit to the Jefferson County Commission on behalf of Herbert Jonkers' Company, Sheridan LLC, by a Demand Letter of Credit Note dated August 27, 2003 in the maximum principal sum of Two Million Seven Hundred Twenty Seven Thousand Seven Hundred Forty Three Dollars and Zero Cents ($2,727,743.00). J.A. 19-20.

4

Executor Hill's blind trust in BB&T enabled it to bring Mr. Jonkers to the table and also allowed the Bank to structure the deal in a recklessly dangerous manner for the Estate while benefiting the Bank's own interest. J.A. 16-18. Particularly, on April 1, 2004, BB&T officials advised Executor Hill that BB&T would lend Mr. Jonkers the money to cover the estate taxes that were due on the Yoe Farm. J.A. 14-15.   A few days later, Executor Hill, while relying entirely upon the advice of the banking and legal professionals, agreed to seller finance the entire deal with Mr. Jonkers and his newly formed business venture, Yoe Properties, LLC, for consideration in the amount of Five Million One Hundred Thousand Dollars and Zero Cents ($5,100,000.00).   He also simultaneously allowed the Bank to steal security from the Beneficiaries. J.A. 16-18.

Consequently on April 12, 2004, Executor Hill, in his capacity as the Executor of the Estate of Harry W. Yoe transferred possession of the Yoe Farm to Yoe Properties LLC.  The newly formed Yoe Properties, LLC *financed* the cash portion of the purchase price for the Real Property with a loan from BB&T in the amount of One Million and One Hundred Thousand Dollars ($1,100,000.00), Yoe Farm Loan Number 9570145700-00001. *Id.* The balance of the purchase price was seller financed by the Yoe Estate, through a promissory note in the amount of Four Million and Two Hundred Thousand Dollars ($4,200,000.00).   The note was secured by a Deed of Trust recorded against the Real Property.  The promissory

5

note secured by the Second Deed of Trust provided that the principal loan amount would be payable to the Estate as follows:   One Million and Seven Hundred Thousand Dollars ($1,700,000.00), was due no later than eighteen (18) months after the execution of the note (October 12, 2005); and Two Million and Five Hundred Thousand Dollars ($2,500,000.00), was payable no later than forty-two (42) months after the execution of the note (October 12, 2007).  Payments on the $2,500,000.00 were to begin accruing interest at 6 percent (6%) after the October 2005 payment to the Estate was made.  As alluded to, at that same time, Executor Hill signed a priority agreement which gave BB&T the first lien position on one of the three tracts of land comprising the Yoe Farm. J.A. 16-18.

Sadly, even though the Estate and the Bank were essentially lending Mr. Jonkers the entire amount on the purchase price of the Yoe Farm, and Mr. Jonkers had other assets, the Estate was given essentially zero guidance by the Bank on how to protect itself.[2] In fact,, when Executor Hill signed the Priority Agreement at the closing on the Yoe Farm, he knew zero about the solvency of Mr. Jonkers, and that additional security might be available through other related corporate entities. Executor Hill had not reviewed an objective credit rating, had not reviewed a credit

---

[2] At a bare minimum the Bank could have advised that Executor Hill might seek additional protection from another one of Mr. Jonkers' other corporate entities. Or better, the Bank could have advised Executor Hill that the Estate could apply for an extension to pay the Estate taxes while the Estate searched for several interested buyers with cash-in-hand to purchase the farm.

history and had not determined whether the bank had preexisting relationships with Mr. Jonkers prior to haphazardly signing away the Estate's Security.[3]  It was not Executor Hill's role, however, to protect the Estate in commercial transactions. Indeed, he testified that he was a retired navy chaplain and had hired the bank solely for its assistance in marketing the commercial property and handling tax related issues.  He also agreed to split his commission as an executor with the bank for those very services.  J.A. 229-30, 324.

---

[3]     Concerning the first subordination agreement, Executor Hill testified in 2013;

> Q.     As you sit here today, you're not aware of there being other relationships involving BB&T, Mr. Grove and Jonkers?
> A.     Other?
> Q.     I mean, if they're lending money on other properties to Mr. Jonkers.
> A.     No, I don't know about that.
> Q.     You didn't do any type of independent review of his credit history prior to entering into this agreement?  Is that something - - -?
> A.     No, sir.  That's why I hired the bank.
> Q.     . . . You hired the professionals to handle that part?
> A.     Yes,sir.
> Q.     Okay.  And you relied upon them solely in handling that aspect of the administration of the estate?
> A.     Yes, sir.

J.A. 229-30.

As the years passed, the Bank continued using its special relationship to the Beneficiaries, and the inattentiveness of Exector Hill, to manuever on security. In fact, through predatory lending practices with Mr. Jonkers, and fraudulent concealments with the Estate Executor, it continued manuevering to gain additional security on properties valued in excess of Eighteen Million Dollars. Specifically, after possession was transferred on the Yoe Farm, BB&T loaned in excess of Ten Million Dollars to non-creditworthy Herbert Jonkers' entities, each time in exchange for additional security. Among the Herbert Jonkers' entities loaned to were Sheridan LLC, a West Virginia limited liability Company owned by Herbert Jonkers; Old Standard LLC, a West Virginia limited liability company owned by Herbert Jonkers, and Yoe Properties, LLC, a West Virginia limited liability company owned by Herbert Jonkers (collectively "Jonkers' Companies").[4] J.A. 19-20, 28.

---

[4] On June 24, 2004 BB&T loaned Old Standard LLC One Million Four Hundred Thousand Dollars and Zero Cents ($1,400,000.00). The loan's purpose was to refinance existing Mr. Jonkers' debt with Central Bank secured by a 407.64 acre tract of land off of Bloomsbury Road in Jefferson County, Charlestown West Virginia ("Old Standard Quarry"). As alleged in the Complaint, Mr. Jonkers was a part owner of Old Standard LLC and served as personal guarantor on the BB&T loan. On September 7, 2004, BB&T also loaned Sheridan, LLC, Eight Million One Hundred Thousand Dollars and Zero Cents ($8,100,000.00) to fund residential land development on the Harpers Ferry Property. J.A. 19-20, 28.

By 2005, however, Mr. Jonkers' credit troubles were not resolving.  Rather, Mr. Jonkers approached BB&T in 2005 requesting a six-month delay to make the first payment on the Yoe Estate's Deed of Trust. *Id*.  On June 8, 2005, Stephen Grove of BB&T informed Herbert Jonkers that BB&T would not extend the payment date for the first note installment of One Million Seven Hundred Thousand Dollars ($1,700,000) due on October 12, 2005 for a period of six months.  Mr. Grove explained to the Beneficiaries that it could not do this because the Bank needed to satisfy "tax liabilities, fiduciary fees and distributions to the Beneficiaries." J.A. 21.

Mr. Grove spun its refusal of Jonkers' extension request to the Beneficiaries as follows, "We feel no obligation to help them out since they own the property and will likely succeed in developing it given the current housing demand in our area.  The remaining funds will be held over to cover contingent liabilities and for other beneficiary distributions.  While Yoe Properties, LLC could default on the loan payment, this would be highly unlikely in our opinion, and we would stand to benefit."  J.A. 21. Mr. Grove and the Bank completely omitted that BB&T had helped Herbert Jonkers, and his shell entities, by loaning them in excess of Twelve Million Dollars in 2003 and 2004 on four separate occasions.  J.A. 19-20. It also failed to disclose a plan to loan Mr. Jonkers additional money.

Incredibly, a few months later, BB&T itself loaned Mr. Jonkers the money that would be distributed to the Beneficiaries. Upon information and belief, on September 28, 2005, Tim Procita of BB&T wrote Stephen Grove and stated "I have a loan approved to lend an additional $1.7MM to Herb to make his payment due to the Yoe Estate. I need to know that you will agree to the following: I need my debt to have a priority lien on Parcels 1 & 3. You can continue to have a priority lien on Parcel 2 (we will have a second and third lien on Parcel 3). This means that you will need to sign a subordination agreement, subordinating your lien on Parcel 1 & 3 at the loan closing." J.A. 23. Rodney Frye of BB&T responded, "Steve will meet with Rob Hill, the executor, tomorrow to gain his approval of the plan." *Id*. The Beneficiaries were not copied on those emails and only discovered that the Bank was directing the efforts of Executor Hill after filing Motions to Compel in the State Court Action.

When approached about the second surbordination agreement on the other two tracts of land in the Yoe Farm, Executor Hill repeated the same mistake he committed in 2004 by failing to exercise diligence in reviewing the Bank's recomendations. He simply relied upon the blind trust of the "professionals" at BB&T to do their job in helping him administer the Estate. During his discovery deposition, Executor Hill testified;

10

Q.    What you do recall though is you were asked by the bank to sign something with regard to priorities on the liens?

A.    Yes.

Q.    And you went to the bank and you didn't encounter Mr. Grove or anyone else that worked for BB&T?

A.    They weren't in the office at the time.

. . .

Q.    And by changing the terms of the loan, you understood it changed with the terms of the loan with both BB&T and the estate?

A.    Yes.

Q.    Did you talk to anyone outside of BB&T about changing the terms of the loan?

A.    No.  It appeared that if the estate was going to get paid, they needed a loan.

. . .

Q.    You trusted BB&T to hand you documents because you thought that they were acting as a fiduciary along with you to the estate?

A.    Yes.

. . .

Q.    Okay.   How long were you there when you saw that document?

A.    Probably about ten minutes.

Q.    Do you recall asking anyone there if you could speak with Mr. Grove or anyone else involved in this?

A.    They weren't in.

11

Q.    Do you recall asking anyone there if you could speak with Mr. Grove or anyone else involved in this?

A.    I didn't feel it was necessary.

Q.    You didn't have any questions.

. . .

A.    No.

Q.    Okay.  Because you we get back to the point that you trusted that BB&T was trying to make all of this work.  So the distribution or the proceeds could go to the beneficiaries?

A.    Yes.

Q.    That was your belief, correct?

A.    Yes.

J.A. 277-292.

At the direction of BB&T, Executor Hill then executed a Consent and Subordination agreement, in which the Estate subordinated its Second Deed of Trust to BB&T's Fourth Deed of Trust. J.A. 23.  As the story eventually unfolds, Executor Hill's gross negligence in signing that second subordination agreement would pay great dividends to the Bank.  Interest payment distributions stopped being made to the Yoe Estate in October 2007. J.A. 25-26.  Additionally, Herbert Jonkers and Yoe Properties LLC defaulted on their obligation to pay the Yoe Estate the remainder of the Two Million Five Hundred Thousand Dollar

12

($2,500,000.00) balance still owed the Yoe Estate.   He would also default on various loans that he had taken with BB&T.  *Id.*

Pertinent to the Appellants' lawsuit, when BB&T realized that Herbert Jonkers' default was eminent, however, the Bank ceased providing *any services to* Executor Hill and the Estate.   It also began ruthless efforts to collect on the security it had slyly obtained in 2004 and 2005. J.A. 26-35.  Even then though, it was only through concealments and cloaking itself as an ally to the Beneficiaries that enabled the Bank to cash in on its early maneuvering.

Almost immediately after defaulting, on February 2, 2008, Beneficiary Robert Yoe wrote Martin Keesecker of BB&T and asked, "Has there been any action on Jonkers?  If necessary I will pay for any additional costs (i.e. property taxes) if we have to foreclose, (I think we should foreclose and put it back on the market).  Thanks for your *help* Bob Yoe." (emphasis added).   J.A. 26.  On April 14, 2008, Rodney Frye from BB&T wrote Attorney Barton and asked him to craft a response to Robert Yoe.

BB&T's Rodney Frye wrote,

I will forward an inquiry from Bob Yoe on our status with regard to the outstanding note owed by Herb Jonkers.  In light of the passage of time, the current status of the market, and Mr. Jonkers capacity to pay, I would like for you to craft a letter to respond to Bob's e-mail questions.   The key question appears to be- - Was it appropriate for the executor to subordinate the estate's position in October 2007 in order to receive the $1,700,000 payment that was then due?  . . . the bank required it[]s first lien position on part of the property to get the

13

> bank to do Herb's loan.  That bought Herb another year to try to sell all or part of the project and gave the estate a little over half of the original sale price.  Please reflect on these issues and help us give Rob Hill an answer to Bob Yoe's questions.

J.A. 26.

On April 15, 2008, Executor Hill, Martin Keesecker, a Trust Officer with BB&T, and Robert Yoe met in BB&T's in Martinsburg, West Virginia office. Rodney Frye, the Vice President in charge of the Trust Department at BB&T also participated by telephone from Virginia.    At this meeting, BB&T officials summarized Executor Hill's actions in signing the priority and subordination agreements. They explained that the Executor had no other choice but to sign because of tax obligations.  BB&T officials also explained that it would be to the Estate's detriment to force a foreclosure sale on the property at that time because BB&T and K. Hovnanian Homes of West Virginia, LLC held secure title above the Yoe Estate. J.A. 27.

In a letter summarizing the April 15, 2008 meeting, Attorney Kenneth Barton wrote,

> I understand that Yoe Properties remains current on its loan to BB&T. In my opinion, the worst thing that could happen for the Estate were for Yoe Properties to default on the loans to BB&T and for BB&T to then foreclose. This would put the Estate in a rather untenable situation since it would have to either satisfy BB&T or have its lien wiped out entirely at the foreclosure sale.  The reason for concern is that subordinate lien holders lose their lien if the property is sold at auction.  If the sale brings enough to pay the senior lien holder and there is something left over, then the subordinate lien holders can be

14

paid.  However, I am not certain that in the current market climate and given the location of the project that a sale would bring enough to pay everyone off.  In my view, in order for the Estate to be certain that it would be made whole, the sale would have to bring Seven Million Eight Hundred Thousand and Eight Hundred Thousand Dollars ($7,800,000.00). Even though there have been five hundred and ninety-five (595) lots approved by the Berkeley County Planning Commission and there are another three hundred and sixty-six (366) fully ready for submission to the Planning Commission, I do not see any local builders willing to take on that kind of debt in this market.

J.A. 27, 381.

Importantly, during the April 15, 2008 meeting, Herbert Jonkers' other loans and properties were not mentioned even though repayment of the Sheridan Loan, Yoe Properties Loan, and Old Standard Loan were the subject of contemporaneous negotiations between Herbert Jonkers and BB&T.  J.A. 28.  Nor did Attorney Barton mention that the Estate might have the possibility of piercing the corporate veil of Jonkers' other sham entities in his letter. J.A. 378-382.  Just two months later, though, on or about June 26, 2008, BB&T entered into a Forbearance Agreement with Herbert Jonkers, Old Standard LLC, Sheridan LLC and Yoe Properties.   In that Agreement, seven separate Jonkers-BB&T loans were rolled into a single Forbearance Agreement.  The Beneficiaries were never told of this Agreement. J.A. 28.

Pursuant to the Forbearance Agreement, BB&T loaned Herbert Jonkers an additional Two Million Dollars in exchange for higher, more secure lien positioning on the aforementioned higher valued Jonkers' properties.   Despite

15

being kept in the dark, the Beneficiaries did inquire about the Estate's status. J.A.

30. In a June 9, 2009 e-mail, the Beneficiaries were again discouraged by Attorney

Barton from filing a lawsuit, however, and advised that it was not in "the Estate's

best interest to incur the legal expense bringing suit against Yoe Properties, LLC."

J.A. 29. Attorney Barton stated in an e-mail, "While the Estate can probably

obtain a judgment, unless it is able to 'pierce the LLC's veil' and reach the assets of

the members, recovery of any money for the estate is doubtful." *Id.* Additionally,

on May 25, 2010, another attorney, James T. Kratovil, of Kratovil & Amore, wrote

Beneficiary Robert Yoe and advised that it looked as though everything was above

board and discouraged them from filing suit. J.A. 383.

It was not until Attorney Barton wrote the Beneficiaries on June 16, 2010

that BB&T had positioned itself into "first" position on all of the Jonkers'

Properties and loan payments on the latest applicable Forbearance Agreements

were past due that the Beneficiaries were that payment on the Estate's note was not

likely to occur. At that point, the Beneficiaries were advised, "Reading between

the lines, I think that the chance for any further payment on the Note due to you

and the other heirs is bleak." J.A. 30. Apparently, the Bank also left the Estate

Attorney in the dark, forcing him to read "between the lines" to give the

Beneficiaries accurate information.

Almost immediately thereafter, Beneficiary Robert Yoe hired counsel to determine whether a lawsuit was merited. A few months later, on December 3, 2010, Appellants filed a Complaint in the Circuit Court of Berkeley County alleging that BB&T and Executor Robert Hill ("Executor Hill") had breached numerous fiduciary obligations owed to Estate of Harry W. Yoe ("Yoe Estate") and futher alleging that BB&T and Executor Hill were negligent when selling the decedent, Harry W. Yoe's farm ("Yoe Farm"). J.A. 31. There were no allegations of fraud contained within that lawsuit, because the Bank had concealed hundreds of documents showing that it directed Executor Hill throught the entire process and that its entire service to the Estate was a sham aimed at finding additional security for existing Bank loans.

Executor Hill, through the attorneys of Steptoe & Johnson PLLC answered the Appellants' Complaint by denying that he had breached any duties to the Appellants. J.A. 31. Steptoe & Johnson did not file a contribution claim, likely because Executor Hill did not possess hundreds of documents concealed by the Bank. Additionally, around January 11, 2011, BB&T, through counsel Rosenberg Martin & Greenberg LLP, filed a Motion to Dismiss the Appellants' Complaint wherein it argued that BB&T was "never appointed as a fiduciary" and was not "recognized as an executor or administrator of the estate" and thus owed "no duty

17

to Plaintiffs." J.A. 31[5].   BB&T also argued in its Motion to Dismiss that the Beneficiaries' negligence claims were barred by the two year statute of limitations. J.A.31-32.

On April 7, 2011, the Circuit Court of Berkeley County, West Virginia granted BB&T's Motion to Dismiss finding that the Appellants lacked standing to sue the Bank, and that BB&T owed no duties to the Beneficiaries.  J.A. 32.  The Berkeley County Circuit Court also found that the statute of limitations had run on the Beneficiaries' negligence claims against the Bank.  *Id.*   The Circuit Court did not allow discovery against the Bank prior to dismissing the Complaint.

The Beneficiaries thereafter continued on with their lawsuit against Executor Hill, engaging in meticulous formal discovery. Appellants obtained some records from a subpoena that they issued on BB&T on June 1, 2012.  Although requested however, the Bank did not provide the transaction history for the account of Harry W. Yoe. J.A. 34.  The Beneficiaries also filed various Motions to Compel against Executor Hill.   After the second Motion to Compel was filed in June 2012, Executor Hill finally turned over his file, producing it on August 14, 2012.   J.A. 32-34.   Executor Hill was also deposed on March 13, 2013.   J.A. 150-377. Finally, while requested in the initial subpoena, it was not until June 27, 2013, and

---

[5] Again, the issue of fraud was never raised because BB&T had never dislcosed hundreds of relavant documents demonstrating how much information it had concealed from Executor Hill.

after the Third Motion to Compel was filed that Appellants finally received the full account history for the Account of Harry W. Yoe. J.A. 384. On December 2, 2013, the Appellants filed a lawsuit in the United States District Court for the Northern District of West Virginia against Appellees alleging violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §1964(c), along with violations of West Virginia statutory and common law.

Sidestepping all of those newly discovered facts, however, the District Court dismissed the Complaint outright. The District Court, extrapolating on the allegation that the Bank had misled the Beneficiaries into believing that it was acting on their behalf, concluded that Appellants' entire Complaint for fraud was based upon the hyper-technical distinction between an executor and an executor's agent. J.A, 412-427. The District Court concluded, "Rosenberg Martin & Greenberg, LLP clearly stated in a 2011 Motion to Dismiss that the Bank was 'never appointed as a fiduciary' and was not 'recognized as an executor administrator of the estate' and thus had 'no duty to Plaintiffs'". JA. 424. The Court also noted that Appellants had sued BB&T in the Berkeley County Circuit Court for breach of contractual fiduciary duties and negligence" and that "[t]he filing of that lawsuit indicates that Plaintiffs knew, or by the exercise of reasonable diligence should have known, that they had been injured. . . and that BB&T's conduct had a causal relation to Plaintiffs' injury."

19

## SUMMARY OF ARGUMENT

Documents discovered from BB&T and Executor Hill after a 2011 Dismissal Order was entered in a similar state court action served as the lynchpin for the Appellants' Complaint for RICO and common law fraud. Those discoveries also form the basis of the Appellants' current claim for relief. In fact, the documents recovered within two years of filing the fraud lawsuit, along with the deposition testimony from Executor Hill, were similar to hundreds of missing but revealing puzzle-pieces in a complex jigsaw landscape. In short, only when the Beneficiaries discovered *some* of the information that was concealed from Executor Hill, Attorney Barton, and themselves did they discover that fraudulent concealment had occurred. Among the pieces of the puzzle uncovered are;

a. While the Priority Agreement and the Subordination Agreement were known of when the Beneficiaries filed suit in 2010, it was unknown that BB&T had loaned Herbert Jonkers and his shell entities in excess of Twelve Million Dollars during the years 2003 through 2005. J.A. 20. In a June 8, 2005 e-mail, Stephen Grove of BB&T and Executor Hill informed the Beneficiaries of their refusal to extend the first payment deadline for Yoe Properties to the Estate, stating, "We feel no obligation to help them out since they own the property and will likely succeed in developing it given the current housing demand in our area. The remaining funds will be held over to cover contingent liabilities and for other beneficiary distributions. While Yoe Properties, LLC could default on the loan payment, this would be highly unlikely in our opinion, and we would stand to benefit." J.A. 21. The other loans to Defendant Jonkers were never mentioned.

b. Newly discovered evidence shows that on or about September 28, 2005, Tim Procita of BB&T wrote Stephen Grove and stated "I have a loan approved to lend an additional $1.7MM to Herb to make his

payment due to the Yoe Estate. I need to know that you will agree to the following: I need my debt to have a priority lien on Parcels 1 & 3. You can continue to have a priority lien on Parcel 2 (we will have a second and third lien on Parcel 3). This means that you will need to sign a subordination agreement, subordinating your lien on Parcel 1 & 3 at the loan closing." Procita's statement was materially and objectively false and the e-mail was concealed from the Beneficiaries. Rodney Frye of BB&T quickly responded to Tim Procita and stated, "Steve will meet with Rob Hill, the executor, tomorrow to gain his approval of the plan." J.A. 23. While the subordination agreement was known about at the time the 2010 lawsuit was filed, that BB&T directed Executor Hill in advising the Beneficiaries was unknown. The Beneficiaries, instead, believed that Executor Hill was actively involved in all decisions and adequately informed at all steps in the process regarding Mr. Jonkers' solvency. Had this information been discovered in 2011, the Beneficiaries would have utilized it to rebut the Bank's argument to the Circuit Court that it was acting only as Executor Hill's "agent".

c. The BB&T Account History produced pursuant to a second Motion to Compel in August 2012 demonstrated that Attorney Barton's law firm had been getting paid by BB&T using estate funds under two separate invoice numbers, Yoe Properties S&J No 995750.00001 file and Harry Yoe Estate S&J No. 412290.00001 file. J.A. 33. The payments to Attorney Barton's law firm appear to have included payments for activities undertaken by Attorney Barton to represent Executor Hill in defending the lawsuit brought by the Beneficiaries. Documents attached to Attorney Barton's June 2013 email, which were produced pursuant to a third Motion to Compel, also showed that the Bank had used estate funds on over two dozen occasions after the second subordination agreement was executed and up and through May 2013. Many of those fees appear to have been incurred defending Executor Hill for breaching fiduciary obligations, fighting Motions to Compel, and explaining away the Bank's actions. Upon information and belief, BB&T chose to pay for these services using Estate funds, even though they had no authorization to do so under West Virginia law. Additionally, documents produced by Executor Hill after the aforementioned Motions to Compel demonstrated that an attorney fee in excess of Twenty Thousand Dollars was authorized for payment from the Estate Account to Rosenberg Martin & Greenberg LLP in

21

2012.   Upon information and belief, the only work that Rosenberg Martin & Greenberg appears to have performed was to draft and argue a Motion to Dismiss. When Executor Hill was deposed, he was unaware a) that a Motion to Dismiss had been filed in Berkeley County Circuit Court, and b) that BB&T had been dismissed from the lawsuit. He was also unaware of who was paying Attorney Barton to defend him in the lawsuit brought by the Beneficiaries in Berkeley County Circuit Court. J.A. 33. Under no good faith scenario could those fees be described as benefiting the estate, rather they demonstrate that the Bank was actively concealing information. See W.Va. Code § 44-5A-6. See also *United States Fidelity & Guar. Co. v. Home Bank*, 77 W. Va. 665, 88 S.E. 109 (W. Va. 1915); and *Gaymon v. Gaymon,* 63 Va. Cir. 264 (Va. Cir. Ct. 2003). J.A. 384.

d.  Newly discovered evidence shows that on April 14, 2008, Rodney Frye from BB&T directed Attorney Kenneth Barton from Steptoe & Johnson to craft a response to Robert Yoe.  BB&T's Rodney Frye wrote, "I will forward an inquiry from Bob Yoe on our status with regard to the outstanding note owed by Herb Yonkers.  In light of the passage of time, the current status of the market, and Mr. Yonkers capacity to pay, *I would like for you to craft a letter* to respond to Bob's e-mail questions.    The key question appears to be- - Was it appropriate for the executor to subordinate the estate's position in October 2007 in order to receive the $1,700,000 payment that was then due?  . . . the bank required it[]s first lien position on part of the property to get the bank to do Herb's loan.  That bought Herb another year to try to sell all or part of the project and gave the estate a little over half of the original sale price.  Please reflect on these issues and help us give Rob Hill an answer to Bob Yoe's questions."(emphasis added). J. A. 26-27.  The Beneficiaries did not realize that the Bank was directing Attorney Barton in communicating certain points with them until they obtained discovery documents in this matter.    Had they known that BB&T was paying his fees and further that it was directing him in advising the Beneficiaries as to whether Executor Hill's actions were "appropriate" they would have refuted the arguments when BB&T argued to the Court that it was acting only as an agent of Executor Hill.  See, *id.*

e.  In 2008, a few months after advising Beneficiary Robert Yoe not to file suit, the Bank entered into a Forbearance Agreement with Herbert

22

Jonkers, Old Standard LLC, Sheridan LLC and Yoe Properties.  In that Agreement, seven separate Jonkers-BB&T loans were rolled into a single Forbearance Agreement with the Bank. Pursuant to the Forbearance Agreement, BB&T loaned Herbert Jonkers an additional Two Million Dollars in exchange for higher, more secure lien positioning on three pieces of property, appraised at **<u>Eighteen Million</u>** Dollars. J.A. 28.  The Beneficiaries were never advised that BB&T was actively engaged in chasing Defendant Jonkers' assets, or that he even had other assets, when advising them against filing suit.  Even worse, a June 9, 2009 e-mail displays that the Beneficiaries were discouraged from filing a lawsuit, and advised by Attorney Barton of Steptoe & Johnson that it was not in "the Estate's best interest to incur the legal expense bringing suit against Yoe Properties, LLC."   The Beneficiaries were advised that even though they could "probably obtain a judgment, unless it was able to 'pierce the LLC's veil' and reach the assets of the members, recovery of any money for the estate is doubtful." J.A. 29.

According to the District Court's interpretation of West Virginia law, the newly discovered evidence was irrelevant, however, because there can never be a fraudulent concealment lawsuit unless the fraud is uncovered within two years from the date of the injury. In other words, if a fraudulent party is successful in hiding evidence of the fraud for two years, they are awarded by escaping liability. This interpretation of West Virginia jurisprudence is entirely false and undermines the underlying logic behind tolling the statute of limitations. Because it misunderstood West Virginia law, the District Court also ignored that BB&T actively engaged in efforts to conceal its actions from 2003 through 2013 to collect on bad loans, and had used its own highly skilled but under-informed agents to confuse the Appellants in their investigation of the Bank's actions.  In

short, the Appellants' fraud allegations did not hinge on whether BB&T was an official "co-executor" but rather concerned whether BB&T misled the Beneficiaries into believing that their interests were aligned when engaging in self-dealing activities under the unwatchful eye of a grossly negligent executor. Put another way, BB&T should not have benefitted from a statute of limitations defense when it engaged in its own efforts to thwart and confuse the Appellants' investigation, especially considering it was contemporaneously squandering the Beneficiaries' inheritance to fund its endeavors.

## STANDARD OF REVIEW

On review of a Rule 12(b)(6) dismissal, the Fourth Circuit Court of Appeals considers a case de novo. See *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 440 (4th Cir. 2011).

## ARGUMENT

**I.    THE STATUTE OF LIMITATIONS ON THE COMMON LAW FRAUD CLAIM DID NOT BEGIN TO ACCRUE UNTIL APPELLANTS OBTAINED RECORDS FROM THE BANK THROUGH SUBPOENAS AND MOTIONS TO COMPEL.**

The evaluation of a dismissal typically concerns whether the complaint asserted "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Crucially, "facts [are construed] in the light most favorable to the plaintiff," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009), and the Court

24

should "draw all reasonable inferences in [their] favor" *Kolon Indus.*, 637 F.3d at 440.

When reviewing a Rule 12(b)(6) dismissal, the Court "is not confined to the four corners of the complaint, but may properly take judicial notice of matters of public record," and may also consider "documents incorporated into the complaint by reference," "as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic," *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009), *Tellabs, Inc. v. Makor Issues & Rights,* Ltd., 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007), and *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. Va. 2014). Additionally, under the Federal Rules of Civil Procedure, the statute of limitations is an affirmative defense, and thus ordinarily must be pleaded and proved by the defendant. *See* Fed. R. Civ. P. 8(c). As a consequence, "a motion to dismiss filed under [Rule] 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred." *Goodman v. PraxAir, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). A court may grant a limitations defense raised in such a motion only in the "relatively rare" circumstance in which "all facts necessary" to the defense "'clearly appear[] *on the face of the complaint*.'" *Id.* (emphasis added). This Court has reversed a Rule 12(b)(6) dismissal on limitations grounds when

25

"the face of the complaint d[id] *not* allege facts sufficiently clear to conclude that the statute of limitations had run." *Id.* at 466 (emphasis added).

Further, even though the Federal Rules of Civil Procedure govern procedural matters in the District Courts, West Virginia substantive law must be applied when determining the applicable statute of limitations for state-common-law-fraud lawsuits. *Wade v. Danek Med.,* 182 F.3d 281, 289 (4th Cir. 1999)(holding that district courts should apply the state statute of limitations and any rule that 'constituted an integral part of the state statute of limitations'".)    Notably, under West Virginia law, claims in tort for misrepresentation (fraudulent or negligent) and fraud are governed by a two-year statute of limitation. *W.Va. Code*, 55-2-12 [1959]. *Trafalgar House Constr. v. Zmm, Inc.*, 211 W. Va. 578, 583-584, 567 S.E.2d 294 (W. Va. 2002).   Under the discovery rule, "the statute of limitations begins to run [only] when the plaintiffs knows, or by the exercise of reasonable diligence, should know (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of <u>that entity has a causal relation to the injury</u>." *Gaither v. City Hosp.,* 199 W. Va. 706, 487 S.E.2d 901 (W. Va. 1997)(recognizing that "discovery rule has its origins in the fact that many times an injured party is unable to know of the existence of any injury or its *cause*")(emphasis added.)

26

## A. Appellants Alleged that BB&T Actively Concealed *Pertinent* Facts.

Under West Virginia law, when a Defendant takes active steps to hide *pertinent* information from an aggrieved party, the statute of limitations is generally tolled. *Trafalgar House Constr. v. Zmm, Inc*., 211 W. Va. 578, 585, 567 S.E.2d 294, 299, 300 (W. Va. 2002). Specifically, the West Virginia Supreme Court of Appeals has recognized that concealments "toll[] the statute of limitations until a plaintiff, acting as a reasonable, diligent person, discovers the essential elements of a possible cause of action[.]" *Id.* at 584, 300. *McCoy v. Miller*, 213 W. Va. 161, 164-165, 578 S.E.2d 355, 359 (W. Va. 2003)(upholding a dismissal but recognizing that the "facts underlying the malpractice at the center of this case were straightforward. There were no concealed or hidden injuries [and] no allegation in this case of fraudulent concealment or any action by Dr. Miller to prevent plaintiff from knowing the cause of his injury.") Moreover, typically, the 12(b)(6) stage is a premature stage for determining whether the statute of limitations has run. See *Beattie v. Skyline Corp.,* 906 F. Supp. 2d 528, 540-541 (S.D. W. Va. 2012)' citing *University of West Virginia Bd. of Trustees v. Van Voorhies*, 84 F. Supp. 2d 759, 768 (N.D. W. Va. 2000), aff'd, 278 F.3d 1288 (Fed. Cir. 2002)(recognizing "a district court may address an affirmative defense on a 12(b)(6) motion to dismiss, but only if all facts necessary to the affirmative defense clearly appear on the face of the complaint.")

27

Importantly, under West Virginia law, "[f]raudulent concealment involves the concealment of facts by one with knowledge or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud." *See* Syl. Pt. 5, *Cordial v. Ernst & Young*, 199 W.Va. 119, 483 S.E.2d 248 (1996).[6] [7] Here, on 17 different occasions in their Complaint, the Appellants/Beneficiaries alleged that the Bank, who alone possessed a view of the entire landscape, purposefully concealed information. J.A. 6-40. For example, the Beneficiaries alleged, "BB&T concealed

---

[6] Here there is little question that the Appellees had a duty to disclose relevant information to Executor Hill and the Beneficiaries and that it breached that duty on numerous occasions. After all, Appellants alleged that Executor Hill hired BB&T solely for the purpose of helping him dispose of the Yoe Farm and ensuring that the Beneficiaries received their portions of the proceeds of the sale. J.A. 9-10, Moreover, under West Virginia law, when a bank has a "special relationship" with parties it has a duty to disclose any information when "withholding that information might damage the borrowers". *Glascock v. City Nat'l Bank,* 213 W. Va. 61, 576 S.E.2d 540 (W. Va. 2002)(recognizing "a bank may always immunize itself from a [special relationship] suit [by] simply making a copy of the information it has and mailing it to the borrower.")

[7] In *Glascock v. City Nat'l Bank,* a bank possessed an inspection report on a construction loan containing "information that major components of the house, including the siding and the sub- flooring, would need to be replaced[;] that the electrical systems might present a safety hazard[;] and . . . many other less significant problems with the house." The Bank did not disclose the report to the buyers, though, prior to modifying its existing loan with them. The buyers later sued the bank "alleging that the bank should have revealed the contents of the report before inducing them to convert the construction loan into a more traditional loan. The Court agreed, holding "where a lender making a construction loan to a borrower creates a special relationship with the borrower by maintaining oversight of, or intervening in, the construction process, that relationship brings with it a duty to disclose any information that would be critical to the integrity of the construction project". *Id.*

28

and/or hid pertinent information from Attorney Barton and otherwise misled him prior to his drafting of a several-page letter to the Beneficiaries. Among other things, BB&T concealed from Attorney Barton the negotiation and creation of a separate Subordination Agreement further reshuffling the lien positions and the identity of various other loans between BB&T and Herbert Jonkers, and the other assets of his that it was pursuing." J.A. 26. Appellants also allege that "it was unknown to Executor Hill, the Beneficiaries, and Attorney Barton that BB&T was maneuvering into a position where it could obtain judgments against Herbert Jonkers and the entities he was involved with while discouraging the Beneficiaries from engaging in that same activity." J.A. 30.

Crucially, as described above, BB&T's Stephen Grove spun the Bank's refusal to grant Mr. Jonkers an extension on payment in 2005 to the Beneficiaries as follows, "We feel no obligation to help them out since they own the property and will likely succeed in developing it given the current housing demand in our area. The remaining funds will be held over to cover contingent liabilities and for other beneficiary distributions. While Yoe Properties, LLC could default on the loan payment, this would be highly unlikely in our opinion, and we would stand to benefit." J.A. 21. Mr. Grove and the Bank completely omitted that BB&T helped Herbert Jonkers and his shell entities out by loaning them in excess of Twelve Million Dollars in 2003 and 2004 on four separate occasions. SJ.A. 19-20.

Had the hidden activities of the Bank been presented to the State Court in 2011, it would have likely not dismissed the case on the basis of the statute of limitations.

Further, as stated above, the *evidence* discovered thus far matches the allegations that the Bank hid information. As mentioned, Executor Hill testified that he did not possess any information concerning Herbert Jonkers when he signed the two subordination agreements. J.A. 156-377. A review of his files obtained through Motions to Compel and the Bank's documents gathered through subpoenas seems to support that fact. Specifically, none of the information relating to Herbert Jonkers and his other loans with BB&T was shared with Executor Hill during his tenure as Executor. In fact, after a third Motion to Compel was filed in the State Court action against Executor Hill, his counsel responded by noting, "The Defendant has provided the Plaintiff with copies of all information and documents that he has in his possession relative to the case at bar. As described in his deposition, he brought all of his materials to undersigned counsel's office and during such a meeting went through and produced approximately 904 pages of documents. *While it is true that there are some gaps in time, these documents are simply not in Mr. Hill's possession."* (emphasis added).

Importantly, Executor Hill's file contained zero information concerning the credit worthiness of Jonkers and whether he had other existing loans with BB&T.

30

J.A. 32-33.   It did not contain any of the documents that the Bank itself held on Mr. Jonkers, Sheridan LLC, or Old Standard.  In other words, his file contained no appraisals, collateral evaluations, or accounting histories on the interest payments and was devoid of any information concerning whether Mr. Jonkers was a credit-worthy borrower. It thus appears that the financial troubles of Mr. Jonkers were concealed from Executor Hill at all times.  In fact, the forbearance agreements were not even included within Executor Hill's file.  Moreover, as Attorney Barton advised the State Court, some of the Accounting documents were incomplete.  *Id.*

In summary, the Appellants' fraud allegations do not hinge on the hyper-technical distinction of whether BB&T was an official "co-executor" but rather concern whether they hid information from the parties who were on the front lines advising the Beneficiaries and whether the intent behind those concealments was fraudulent.   And with regard to the asserted statute of limitations defense, the question regarding the Appellants' delay and reasonableness is directly related to the discovery of what the Bank was doing with the account.  After all it was not until June 27, 2013, and after a lawsuit against the bank was filed and dismissed, three Motions to Compel were submitted, two subpoenas were issued and partially responded to, numerous letters were sent by counsel to the Bank and its attorneys, and tens of thousands of dollars were spent on legal fees, that BB&T finally provided Appellants with a complete Account Log for Harry W. Yoe's Account.

31

Only when the Beneficiaries conducted discovery and possessed the complete picture did the Bank's fraud finally become discoverable. For example, through a Motion to Compel, on or around June 27, 2013, the Beneficiaries discovered that after the second subordination agreement the following payments were made from BB&T to the Estate's Attorney,

    a. Distribution to Steptoe & Johnson PLLC Harry Yoe Estate File: 995750.00001 Invoice 458323 Re: Yoe Properties LLC in the amount of One Thousand Eight Hundred Eighty Five Dollar and Fifty Cents ($1,885.50).

    b. Legal Expenses Paid to Steptoe & Johnson F/B/O Yoe Properties LLC Professional Ser in Connect W/Yoe Prop LLC Thru 7/31/08 File 995750.000001/Inv.: 478248; in the amount of One Hundred Twenty Dollars and Fifty Cents ($120.50);

    c. Legal Expenses Paid to Steptoe & Johnson PLLC Services of Yoe Properties LLC Inv. 481487 No. 995750 Thru 8/31/08 . . . " in the amount of One Thousand Four Hundred Eight One Dollars and Fifty Cents ($1,481.50);

    d. Legal Expense Paid to Steptoe & Johnson PLLC Prof Service thru 11/30/2008 concerning Yoe Prop LLC File: 995750:00001 Inv: 488625 in the Amount of Two Hundred Sixty Five Dollars and Fifty Cents, $265.50

    e. Legal Expense Paid to Steptoe & Johnson PLLC Prof Services/ Harry Yoe Est Invoice 498484Re: Yoe Prop S&J 995750-000001 in the amount of Seventy Six Dollars and Twenty Five Cents;

    f. Legal Expense Paid to Steptoe & Johnson PLLC Invoice 501357/Yoe Properties S&UJ #995750.00001 in the amount of Seventy Six Dollars and Twenty Five Cents $76.25;

    g. Legal Expenses paid to Steptoe & Johnson PLLC Inv 510403/Yoe Properties S&J #995750.00001 in the

32

amount of Seventy Six Dollars and Twenty Five Cents.

h. Legal Expense Paid to Steptoe & Johnson Inv 532190/Yoe Properties on July 17, 2010 in the amount of $487.50.00

i. Legal Expense Paid to Steptoe & Johnson Inv 54163/Yoe Properties S&J #995750.00001 in the amount of $97.50;

j. Attorney Fee to Steptoe & Johnson Inv 545825/Yoe Properties S&J No 995750.00001 in the amount of $325.00.

k. Legal Expense Paid to Steptoe & Johnson PLLC Inv 548665/File 4122290.00001 Harry Yoe Estate in the amount of $170.85

l. Attorney Fee to Steptoe & Johnson Inv. 5499895 in the amount of $709.50;

m. Attorney Fee to Steptoe & Johnson PCC Inv 552840 /S&J #412290.00001 Harry W. Yoe in the amount of $688.50

n. Attorney Fee to Steptoe & Johnson PLLC Inc 555084/Harry Yoe Estate in the amount of $253.00

o. Attorney Fee to Steptoe & Johnson PLLC Inv 558327/Heirs of Harry Yoe in the amount of $2,144.

p. Attorney Fee to Steptoe & Johnson PLLC Inv 541068/File 412290.00001 Hary Yoe Est in the amount of $38.50

q. Attorney Fee to Steptoe & Johosn PLLC Inv 575905/Harry W. Yoe S&J #412290.00001 in the amount of $462.00;

r. Attorney Fee to Stepote PLLC Invoice 586160 Harry W. Yoe Est in the amount of $437.50

s. Attorney Fee Paid to Steptoe & Johnson PLLC Inv 588773/Harry W. Yoe Est S& J 312290.00001 in the amount of 787.50;

t. Attorney Fee to Steptoe & Johnson PLLC Inv 589696 in the amount of $175.00

u. Attorney Fee to Steptoe & Johnson in the amount of $350.00

v. Attorney Fee to Steptoe & Johnson PLLC Inv. 596110 in the amount of $2517.05

33

w. Attorney Fee to Steptoe & Johnson PLLC S&J in the amount of 122.50

x. Attorney fee to Steptoe & Johnson PLLC Inv 611557 of $281.25

y. Attorney fee to Steptoe & Johnons PLLC of $3,193.22.

J.A. 384.[8]

As alluded to above, in August 2012, and after a Second Motion to Compel was filed, the Beneficiaries also uncovered emails from the Bank to Attorney Barton, wherein it demonstrated that the Bank was directing his communications. For example, before Attorney Barton wrote Executor Hill in 2004 and advised that the Yoe Properties deal was an excellent transaction for the Estate, a Bank official advised Executor Hill that Attorney Barton would be preparing a letter for him about the soundness of the deal. J.A. 33, 349.  Then again, in 2008, Bank officials wrote attorney Barton and stated, "I would like for you to craft a letter to respond to Bob's e-mail questions.   The key question appears to be -- Was it appropriate for the executor to subordinate the estate's position in October 2007 in order to receive the $1,700,000 payment that was then due? . . . the bank required it[]s first lien position on part of the property to get the bank to do Herb's loan.  That bought Herb another year to try to sell all or part of the project and gave the estate a little over half of the original sale price.  Please reflect on these issues and help us give

---

[8] Executor Hill was also unaware that the Estate was paying BB&T's legal fees in this lawsuit.  Shockingly, Executor Hill did not even know what the fees were being used to fund.

Rob Hill an answer to Bob Yoe's questions."  Again, the Beneficiaries discovered that e-mail in August 2012 after a second Motion to Compel Executor Hill's Discovery responses was filed. J.A. 32-33.

Additionally, only when he was deposed did Executor Hill admit that he was not authorizing certain payments from the Estate Account.  In fact, Executor Hill acknowledged during his 2013 deposition that he was not authorizing payments for his defense.  Obviously, if Appellants/Plaintiffs possessed both of those pieces of information in 2011, they would have brought it to the Court's attention when the Bank argued that Executor Hill was acting as an agent for the Bank.  For example, they could have argued that the Bank was treating the Estate Account as though the Bank was an executor while at the same time arguing that it was not a fiduciary.  It would have also demonstrated the Bank's role in captaining the ship.  That information is direct evidence that the Bank concealed information from the Beneficiaries and that it detrimentally impacted them.

Perhaps the best example of the reasonableness of the Appellants' delay in filing suit until 2013, however, and the error in the District Court's reasoning, concerned Executor Hill's 2013 testimony that the Bank was acting for the benefit of the Beneficiaries.  After all, Executor Hill has known since July 16, 2003 when he visited the Fiduciary Office in the Berkeley County Court House that the Berkeley County Fiduciary Office refused to certify BB&T as co-executors of the

35

estate. J.A. 9.  As late as 2013, however, Executor Hill still insisted that the Bank

was acting as co-executors in an unofficial capacity.

> Q.    But are you aware that argument was made and the court considered
>       their statements?  To wit, that BB&T was no co-executor of this estate
>       with Robert Hill?
>
> A.    No. Well I was not aware of that.  Because the contract I signed said
>       they were.

J.A. 229-30.

Simply put, Executor Hill's confusion alone shows that the concealments of

the Bank created an issue of fact.  Crucially, as the West Virginia Supreme Court

Appeals recognized in *Stemple v. Dobson,* 184 W. Va. 317, 321, 400 S.E.2d 561,

564 (W. Va. 1990), "where a cause of action is based on tort or on a claim of fraud,

the statute of limitations does not begin to run until the injured person knows, or by

the exercise of reasonable diligence should know, of the nature of his injury, and

determining that point in time is a question of fact to be answered by the jury";

*Trafalgar House Constr.,* at 584, 567 S.E.2d 294 (W. Va. 2002)(recognizing that

the determination concerning when a reasonably prudent person should have

discovered fraud should be left to the trier of fact.)   See also, *CSX Transp., Inc. v.

Gilkison*, 406 Fed. Appx. 723 (4th Cir. W. Va. 2010)per curium, ("Viewed in the

light most favorable to CSX, the complaint alleges the same facts as to the West

Virginia common law fraud counts as recounted above regarding the RICO counts.

For the same reasons . . . concerning the RICO counts, the pled facts do not reveal

when CSX knew or should have known of the alleged fraud. That is, the face of the complaint does not plead facts which conclusively show CSX knew or should have known of the alleged fraud by July 4, 2005, two years prior to the filing of the complaint"); *Wilson v. Xander*, 182 W. Va. 342, 344, 387 S.E.2d 809, 811 (W. Va. 1989)("it is "precipitous" for the trial judge to grant a motion for summary judgment before the completion of discovery. . . .  That learning is plain in a case like this one, where the plaintiffs suspect some shenanigans on the other side and must rely on discovery to reveal whether they have a case at all and, if so, how they might prove it."

### B. The Bank's Role in Advising the Beneficiaries Against Filing Suit Earlier Created Additional Tolling.

Under West Virginia law, being suspicious of fraud and conducting an investigation into the fraud does not start the running clock on the statute of limitations in all circumstances.  Specifically, when representations are made to divert the suspicions of a potential plaintiff, the question on the accrual of the statute of limitations shifts from the date of the injury to the date when it was no longer reasonable for a party to rely upon the representation of the defrauding party.  For example, '[t]he representee who attempts investigation may have a right to rely upon the representations where expert knowledge is necessary to an effectual investigation, which knowledge is possessed by the party making the representations, and not by the other." *Citing Cordial v. Ernst & Young,* 199 W.

Va. 119, 132-133, 483 S.E.2d 248, 261-262 (W. Va. 1996). When "the representee, instead of investigating as fully as he may, makes only a partial investigation and relies in part upon such investigation and in part upon the representations of the adverse party, and is deceived by such representations to his injury, it is held that he has a right to rely on, and may maintain an action for, such deceit. This rule is particularly applicable where the representations were designed to deter further investigation." *Id.*

Notably, the resolution of these issues should also normally be left to the jury. As the West Virginia Supreme Court held in *Trafalgar House Constr.*, at 585, 300; "A jury could reasonably conclude that the appellees concealed facts regarding the subsurface conditions of the site from the appellees, with a fraudulent intent, facts that the appellees had a duty to disclose. A jury could also reasonably conclude that, even though the appellants conducted an independent investigation of the site, the representations made by the appellees contributed <u>in part</u> to the formation of the conclusion by the appellants that sufficient quantities of usable rock and dirt existed on the site to complete the project." (emphasis added). *Id.*

Here, the Beneficiaries relied upon the advice and counsel of a legal professional who was being controlled by the Bank. As alleged in the Complaint, BB&T advised the Beneficiaries on numerous occasions that Attorney Barton was acting on behalf of and for the estate. See *Complaint,* previously filed herein at

38

§36.  Crucially, it was Attorney Barton, one of the leading commercial transactions and estate planning lawyers in West Virginia who advised Beneficiary Robert Yoe in 2008, "As I told you at our meeting of April 15, 2008, I cannot find any fault with Reverend Hill's decision to enter into the subordination agreement.  . . Frankly, I do not think that Reverend Hill really had much choice but to agree to it. In light of where [we] are now, the Estate could still be owed the full amount had that payment not been made  .  .  . it remains my conclusion that while foreclosure is a possible course to take, I do not think that it is in the best interest of the Estate because the Estate, at a minimum, would have to satisfy that superior lien holders in order to obtain full control of the property." J.A. 408-09

Thereafter, on June 12, 2009, Attorney Barton again wrote the Beneficiaries (with bank officials copied on the e-mail) and stated,

> If the estate wants to bring suit for a breach of contract in failing to pay the note, it can do so, but other than the property, I doubt that Yoe Properties, LLC has any assets to pay a judgment. It may also create a default under the bank's Deed of Trust which is superior to the Estate's. The Estate could also foreclose on its Deed of Trust. The problem for the Estate is that it is subordinate to the bank. In order to get the property back, the estate will have to pay off the bank (unless someone is willing to purchase the property and pay off the Estate and the bank, which is highly unlikely). I doubt that anyone will want to purchase the Estate's lien position.  I do not think that it is in the Estate's best interest to incur the legal expense bringing suit against Yoe Properties, LLC.

39

> While the Estate can probably obtain a judgment, unless
> it is able to "pierce the LLC's veil" and reach the assets of
> the members, recovery of any money for the estate is
> doubtful.

J.A. 378-382.

Importantly, on both of the aforesaid occasions, Attorney Barton was purportedly looking at the entire landscape of what had happened to the Estate's ludicrously risky loan and the failure of Mr. Jonkers to pay the remaining $2,500,000. After doing so, Attorney Barton neglected to advise them at any point to file suit against anyone, including BB&T.[9] In fact he did the opposite.

To be abundantly clear, Appellants have seen no evidence suggesting that Executor Hill, Attorney Kenneth Barton, Jr., or the law firm of Rosenberg Martin & Greenberg LLP, engaged in any acts of fraud, nor do they assert that any of them *unlawfully* took part in stealing the Appellants' inheritance (along with the other Jonkers' properties). In fact, Attorney Barton himself was forced to "read between the lines" when he advised the Beneficiaries in 2010 that it was unlikely that any further payments were received. Instead, Appellants simply assert that Executor Hill's reputation as a minister and his relationship to the Beneficiaries,

---

[9] Also worth noting, in 2010, another respected attorney, James T. Kratovil, of Kratovil & Amore, looked at the matter to determine the respective rights of the parties. On May 25, 2010, he wrote Appellants and advised that it looked as though everything was above board and discouraged them from filing suit. J.A. 383.

along with Attorney Barton's status as a prominent commercial real estate attorney made them the perfect syringes to unknowingly inject half-truths and outright lies on behalf of the Bank.

Regardless, it offends the law of West Virginia to punish the Beneficiaries for following the advice of legal and banking professionals who the Bank advised were acting for their benefit. *Beattie v. Skyline Corp.,* 906 F. Supp. 2d 528, 540 (S.D. W. Va. 2012)("Plaintiffs should not now be penalized for having given Defendants a chance to make the repairs before bringing this legal action.") See, *Blake v. Charleston Area Med. Ctr.*, 201 W. Va. 469, 477, 498 S.E.2d 41, 49 (W. Va. 1997)("defendant cannot justly object to being sued on a part or phase of a claim that the plaintiff failed to include in an earlier action because of the defendant's own fraud. . . The result is the same when the defendant was not fraudulent, but by an innocent misrepresentation prevented the plaintiff from including the entire claim in the original action.).

## CONCLUSION

The judgment of the district court should be reversed and the case remanded with instructions to reinstate the common-law f r a u d claim.

## REQUEST FOR ORAL ARGUMENT

Counsel for Appellants requests oral argument.

41

Respectfully submitted,

*/s/ Richard W. Weston*
Richard W. Weston
Weston Law Office
621 6th Avenue
Huntington, WV 25701
(304) 522-4100

*Counsel for Appellants*

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. 14-1275    **Caption:** Robert Yoe v. Branch Banking & Trust Company

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[✓] this brief contains ___10,853___ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[✓] this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 [*identify word processing program*] in Times New Roman, 14 Point [*identify font size and type style*]; **or**

[ ] this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) Richard W. Weston

Attorney for Appellant

Dated: 6/4/2014

# CERTIFICATE OF SERVICE

I certify that on <u>June 4, 2014</u> the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

RYAN J. AARON
DAVID ALLEN BARNETTE
JACKSON KELLY, PLLC
1600 Laidley Tower
500 Lee Street, Suite 1600
Charleston, WV 25322
(304) 340-1082

WILLIAM J. HALLAM
ROSENBERG, MARTIN & GREENBERG, LLP
25 South Charles Street, Suite 2115
Baltimore, MD 21201
(410) 727-8545

| | |
|---|---|
| /s/ Richard W. Weston | 6/4/2014 |
| Signature | Date |